No. 23-50840 consolidated with No. 23-20845

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

TAEGAN RAY CONTRERAS,
*Defendant-Appellant.*

―――――――――

Appeal from the United States District Court
for the Western District of Texas, No. 7:23-cr-76

―――――――――

## BRIEF FOR THE FIFTH CIRCUIT FEDERAL PUBLIC DEFENDER OFFICES AS AMICI CURIAE SUPPORTING APPELLANT TAEGAN RAY CONTRERAS

―――――――――

JASON D. HAWKINS
Federal Public Defender
Northern District of Texas

PHILIP G. GALLAGHER
Interim Federal Public Defender
Southern District of Texas

JOHN D. MCELROY
Federal Public Defender
Eastern District of Texas

OMODARE JUPITER
Federal Public Defender
Northern & Southern Districts
of Mississippi

CLAUDE J. KELLY
Federal Public Defender
Eastern District of Louisiana

REBECCA L. HUDSMITH
Federal Public Defender
Middle & Western Districts of
Louisiana

MAUREEN SCOTT FRANCO
Federal Public Defender
Western District of Texas

CARL R. HENNIES
Assistant Federal Public Defender
300 Convent Street, Suite 2300
San Antonio, Texas 78205
(210) 472-6700

*Counsel for Amici Curiae*

# CERTIFICATE OF INTERESTED PERSONS

### United States v. Taegan Ray Contreras,
### No. 23-50840 consolidated with No. 23-20845

The undersigned counsel of record certifies that the persons having an interest in the outcome of this case are those listed below:

1. **Taegan Ray Contreras,** Defendant-Appellant;

2. **Jaime Esparza,** U.S. Attorney;

3. **Brandi Young, Maria Lopez,** and **Mark Tindall,** Assistant U.S. Attorneys, who represented Plaintiff-Appellee in the district court;

4. **Joseph Gay, Elizabeth Berenguer,** and **Lauren Tanner Bradley,** Assistant U.S. Attorneys, who represent Plaintiff-Appellee in this Court;

5. **James Glenn Harwood, Peter Smythe,** and **Ahne J. Stolarczyk,** who represented Defendant-Appellant in the district court;

6. **Kimberly S. Keller,** who represents Defendant-Appellant in this Court;

7. **Maureen Scott Franco,** Amicus Curiae and Federal Public Defender for the Western District of Texas;

8. **Jason D. Hawkins,** Amicus Curiae and Federal Public Defender for the Northern District of Texas;

9. **Philip G. Gallagher,** Amicus Curiae and Interim Federal Public Defender for the Southern District of Texas;

10. **John D. McElroy,** Amicus Curiae and Federal Public Defender for the Eastern District of Texas;

11. **Rebecca Hudsmith,** Amicus Curiae and Federal Public Defender for the Middle and Western Districts of Louisiana;

12. **Claude J. Kelly,** Amicus Curiae and Federal Public Defender for the Eastern District of Louisiana;

13. **Omodare Jupiter,** Amicus Curiae and Federal Public Defender for the Northern and Southern Districts of Mississippi; and

14. **Carl R. Hennies,** Assistant Federal Public Defender, and counsel for Amici Curiae.

This certificate is made so that the judges of this Court may evaluate possible disqualification or recusal.

s/ Carl R. Hennies
CARL R. HENNIES
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

Table of authorities ........................................................ iv

Interest of amici curiae .................................................... 1

Introduction ................................................................. 2

Argument ..................................................................... 4

I.  Supervised-release status is irrelevant to an as-applied
    Second Amendment challenge to § 922(g)(1) ............................ 4

    A.  Courts can consider *only* prior convictions punishable
        by more than one year when deciding an as-applied
        challenge to § 922(g)(1). ....................................... 4

    B.  The government misplaces reliance on supervised-
        release status, which is irrelevant to an application of
        § 922(g)(1). .................................................... 5

    C.  The government's out-of-circuit authority relying on
        supervised-release status to uphold § 922(g)(1)
        convictions conflicts with *Diaz* ............................... 6

II. Section 922(g)(1) violates the Second Amendment as
    applied to someone with a prior conviction for possessing a
    gun as an unlawful drug user. ....................................... 8

    A.  To justify § 922(g)(1), the government must establish
        that the underlying conviction triggered the death
        penalty or estate forfeiture. ................................... 9

    B.  The government cannot show that being an unlawful
        drug user in possession of a gun was punishable by
        death or forfeiture at the Founding ............................11

    C.  The government's alternative arguments are
        foreclosed by *Diaz* or at odds with the historical
        evidence ....................................................... 14

Conclusion .................................................................. 18

# TABLE OF AUTHORITIES

## Cases

*City of Los Angeles v. Patel,*
576 U.S. 409 (2015) ........................................................................ 7

*United States v. Connelly,*
117 F.4th 269 (5th Cir. 2024)........................................... 11, 12, 13

*United States v. Daniels,*
77 F.4th 337 (5th Cir. 2023),
*cert. granted, judgment vacated,* 144 S. Ct. 2707 (2024) ............ 17

*United States v. Diaz,*
116 F.4th 458 (5th Cir. 2024)................................................. *passim*

*United States v. Goins,*
118 F.4th 794 (6th Cir. 2024) ...................................................... 6, 8

*United States v. Moore,*
111 F.4th 266 (3d Cir. 2024)...................................................... 6, 7, 8

*United States v. Rahimi,*
144 S. Ct. 1889 (2024) .................................................... 14, 15, 16

## Statutes

18 U.S.C. § 922(g)(1) ............................................................. *passim*

18 U.S.C. § 922(g)(3)............................................................. *passim*

1867 Kan. Sess. Laws 25 ........................................................ 13, 14

1883 Wis. Sess. Laws 290 ...................................................... 13, 14

1909 Idaho Sess. Laws 6......................................................... 13, 14

Gun Control Act of 1968,
Pub. L. 90-618, § 102, 82 Stat. 1213, 1220–21 ........................... 12

Mo. Rev. Stat. § 1274 (1897) .................................................. 13, 14

**Rules**

Fed. R. App. P. 29(a)(4)(E) ................................................................. 1

**Other Authorities**

Gov't Supp. Br.,
 *United States v. Diaz*, No. 23-50452 (5th Cir. June 28, 2024).... 15

**INTEREST OF AMICI CURIAE**

The Federal Public Defender Offices for the judicial districts in the Fifth Circuit represent indigent defendants in federal court in each office's respective district or districts and in this Court under the Criminal Justice Act. These offices have a unique expertise in all areas of federal criminal law and defend most defendants charged with violating the federal felon-in-possession statute, 18 U.S.C. § 922(g)(1), in this circuit. Thus, these offices have a strong interest in the methodology this Court applies to resolve Second Amendment challenges to § 922(g)(1).[1]

_____

[1] No party's counsel authored this brief, and no person or entity contributed money that was intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(a)(4)(E).

## INTRODUCTION

In *United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024), this Court applied the Supreme Court's recent Second Amendment caselaw and established a framework for analyzing as-applied challenges to the federal felon-in-possession statute, 18 U.S.C. § 922(g)(1). The Court first held that the statute is presumptively unconstitutional because it prohibits conduct protected by the Second Amendment. *Id.* at 466–67. The Court then held that whether § 922(g)(1) is constitutional as applied to a particular defendant depends on whether the Founding generation punished the underlying felony conviction by death or permanent estate forfeiture. *Id.* at 467–70. Because capital punishment and estate forfeiture "permanently punish[ed] offenders" convicted of certain crimes, the Court reasoned, "then the lesser restriction of permanent disarmament that § 922(g)(1) imposes is also permissible." *Id.* at 469. The Court left the door open, however, to "as-applied challenges by defendants with different predicate convictions" not severely punished at the Founding. *Id.* at 470 n.4.

This case presents one of the Court's first opportunities to apply the *Diaz* framework. The government advances two theories for

why § 922(g)(1) is constitutional as applied to Taegan Ray Contreras, but both are irreconcilable with *Diaz*.

*First*, the government argues that § 922(g)(1) is constitutional as applied to Contreras because he was on supervised release when he possessed the gun in this case. His supervised-release status, however, has nothing to do with § 922(g)(1). The government's argument relies on out-of-circuit law but is foreclosed in this Court. As the Court explained in *Diaz*, an as-applied challenge to § 922(g)(1) considers *only* the conduct triggering the prohibition on gun possession—prior convictions punishable by more than one year in prison. Supervised-release status is irrelevant.

*Second*, the government points to Contreras's prior conviction for possessing a gun as an unlawful user of a controlled substance in violation of 18 U.S.C. § 922(g)(3). But the government never tries to establish that this offense was severely punished at the Founding. And it was not. As this Court has recognized, there was no regulation of guns and drugs at the Founding. And the closest analogue— intoxicated-carry laws—carried only small fines or short jail terms. Because America has no tradition of permanently punishing individuals with convictions similar to Contreras's, § 922(g)(1) violates the Second Amendment as applied to him.

Under a straightforward application of *Diaz*, the Court should hold that § 922(g)(1) violates the Second Amendment as applied to Contreras.

## ARGUMENT

### I.  Supervised-release status is irrelevant to an as-applied Second Amendment challenge to § 922(g)(1).

The government claims that § 922(g)(1) is constitutional as applied to Contreras because he committed the offense "while serving a term of supervised release." Gov't Br. 42–43; *see* Gov't *Moore/Goins* Rule 28(j) Ltr. 1–2. But *Diaz* firmly forecloses that argument. Under *Diaz*, a court evaluating an as-applied challenge to § 922(g)(1) can consider *only* the conduct triggering the prohibition on gun possession—prior convictions punishable by more than one year in prison. A person's supervised-release status is simply irrelevant to that analysis.

### A.  Courts can consider *only* prior convictions punishable by more than one year when deciding an as-applied challenge to § 922(g)(1).

In *Diaz*, this Court explained that when evaluating a Second Amendment challenge to § 922(g)(1), a court can consider *only* "convictions that are 'punishable by imprisonment for a term

exceeding one year.'" *Diaz*, 116 F.4th at 467 (quoting 18 U.S.C. § 922(g)(1)). Past conduct that did not result in a conviction punishable by more than one year is "not relevant." *Id.* Even misconduct occurring at the same time as the charged gun possession is irrelevant because "that charge must … rely on previous history." *Id.*

## B. The government misplaces reliance on supervised-release status, which is irrelevant to an application of § 922(g)(1).

Under the *Diaz* framework, a person's supervised-release status is irrelevant to § 922(g)(1). Section 922(g)(1) *does not* prohibit gun possession during a term of supervised release. And the conduct that § 922(g)(1) *does* prohibit—gun possession by someone "who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year"—has nothing to do with supervised release. Indeed, the fact that a person may be violating the terms of their supervised release while possessing a gun is like other misconduct a defendant may commit while possessing a gun—it is irrelevant to the analysis because a § 922(g)(1) charge must rely on "previous history," not concurrent conduct. *Diaz*, 116 F.4th at 467.

Contreras's gun possession may be a valid basis for revoking his supervised release. *See* Gov't Br. 47–48. But that is a different issue than whether his supervised-release status can justify a new conviction under § 922(g)(1). It cannot. The fact that Contreras possessed a gun while he was on supervised release does not impact his as-applied Second Amendment challenge to § 922(g)(1).

### C. The government's out-of-circuit authority relying on supervised-release status to uphold § 922(g)(1) convictions conflicts with *Diaz*.

To support its defense of § 922(g)(1) as applied to a defendant on supervised release, the government points to two out-of-circuit cases: *United States v. Moore*, 111 F.4th 266 (3d Cir. 2024), and *United States v. Goins*, 118 F.4th 794 (6th Cir. 2024). *See* Gov't *Moore/Goins* Rule 28(j) Ltr. 1–2. But both cases conflict with *Diaz*.

As discussed above, *Diaz* allows courts to consider *only* "prior convictions that are 'punishable by imprisonment for a term exceeding one year.'" 116 F.4th at 467 (quoting 18 U.S.C. § 922(g)(1)). The Third and Sixth Circuits, by contrast, allow courts to consider a much wider universe of facts. In the Sixth Circuit, courts "may consider a defendant's entire criminal record—not just the specific felony underlying his § 922(g)(1) conviction." *Goins*, 118

F.4th at 804. And the Third Circuit held that the particular circumstances giving rise to an as-applied challenge "include facts beyond the predicate offenses alleged in the indictment." *Moore*, 111 F.4th at 273.

Even more to the point, those courts ask the wrong question. The question is *not*, as the Third Circuit framed it, "[d]oes a convict completing his sentence on supervised release have a constitutional right to possess a firearm?" *Id.* at 267. Congress has not enacted a law banning gun possession by individuals serving a term of supervised release. If it had, the analysis in *Moore* and *Goins* may be relevant. The question, as this Court recognizes, is whether "the Nation has a longstanding tradition of disarming someone with a criminal history analogous to [the defendant's]." *Diaz*, 116 F.4th at 467.

*Moore* and *Goins* are also in significant tension with Supreme Court guidance on as-applied challenges. As the Supreme Court has explained, an "application" of a statute considers only conduct that the challenged statute "actually authorizes or prohibits." *City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015). Situations that "do not involve actual applications of the statute" are "irrelevant" to the analysis. *Id.* at 417–19. By limiting applications of § 922(g)(1) to the

conduct actually prohibited by the statute, *Diaz* faithfully applied Supreme Court precedent. *Moore* and *Goins*—by allowing courts to examine facts irrelevant to § 922(g)(1)'s prohibition—did not.

*     *     *

In short, *Diaz* forecloses the government's argument that Contreras's supervised-release status justifies his § 922(g)(1) conviction.

## II. Section 922(g)(1) violates the Second Amendment as applied to someone with a prior conviction for possessing a gun as an unlawful drug user.

The government also defends § 922(g)(1) as applied to Contreras by citing his earlier conviction for possessing a gun as an unlawful user of a controlled substance in violation of § 922(g)(3). *See* Gov't Br. 40–46; Gov't *Diaz* Rule 28(j) Ltr. 1–2. But the government never tries to make the threshold showing *Diaz* requires—that possessing a firearm as an unlawful drug user was severely punished at the Founding. It was not. And the government's alternative arguments—that the government can disarm anyone convicted of a "serious crime," that a § 922(g)(3) conviction is more serious than the theft conviction in *Diaz*, and that § 922(g)(3) resembles historical

going armed laws—all fail because they are at odds with *Diaz* and the historical evidence.

### A. To justify § 922(g)(1), the government must establish that the underlying conviction triggered the death penalty or estate forfeiture.

In *Diaz*, this Court held that to survive an as-applied challenge to § 922(g)(1), "the government must demonstrate that the Nation has a longstanding tradition of disarming someone with a criminal history analogous to [the defendant's]." 116 F.4th at 467.

The Court first turned to "historical laws authorizing capital punishment and estate forfeiture" for certain felonies. *Id.* at 467, 469. As for "why" these traditions burden the right to bear arms, the Court reasoned that the purpose of capital punishment and forfeiture ("deterrence, retribution, and penitence") is relevantly similar to the justification for § 922(g)(1) ("to deter violence and lawlessness"). *Id.* at 469. As for "how" they burden the right, the Court emphasized that execution, estate forfeiture, and § 922(g)(1) all "permanently punish[ ] offenders." *Id.* at 469. The Court reasoned that "if capital punishment was permissible to respond to theft"—the underlying felony there—"then the lesser restriction of permanent disarmament that § 922(g)(1) imposes is also

permissible." *Id.* at 469. Thus, *Diaz* upheld § 922(g)(1) as applied to modern-day felons whose underlying felony "would have led to capital punishment or estate forfeiture" at the time of the Founding. *Id.* at 469–70. But the Court noted that not all modern felony convictions would support permanent disarmament and left open the possibility of "as-applied challenges by defendants with different predicate convictions" that were not severely punished at the Founding. *Id.* at 468–70 & n.4.

The Court noted that it "could stop" with these punishment-focused laws. *Id.* at 470. But *Diaz* then considered "firearm-focused evidence as well, to further illuminate the 'how' of our country's tradition of punishment." *Id.* The Court identified proposals from two state constitutional conventions and going armed laws as imposing a comparable burden to § 922(g)(1). *Id.* at 470–71. But it acknowledged that the justification behind these laws—the "why"—does not support disarming someone "whose underlying convictions do not inherently involve a threat of violence." *Id.* at 471 n.5. So the Court recognized that these traditions could not, on their own, justify § 922(g)(1) as applied to Diaz. *Id.* at 471. Instead, they must be "[t]aken together" with the laws authorizing severe

punishment. *Id.* In other words, a tradition of severe punishment was necessary to uphold § 922(g)(1).

**B. The government cannot show that being an unlawful drug user in possession of a gun was punishable by death or forfeiture at the Founding.**

Contreras's underlying conviction—possessing a firearm as an unlawful user of a controlled substance—was not punishable by death or permanent estate forfeiture at the Founding. Neither in its Rule 28(j) letter discussing *Diaz* nor at oral argument did the government even try to make such a showing. That failure is fatal because "the government must demonstrate that the Nation has a longstanding tradition of disarming someone with a criminal history analogous to this." *Diaz*, 116 F.4th at 467. And the historical record shows no tradition of permanently disarming someone with a similar criminal history.

*First*, possessing a gun as a user of an unlawful substance was not even a crime at the Founding—much less one punished severely. "There was very little regulation of drugs (related to firearm possession or otherwise) until the late 19th century." *United States v. Connelly*, 117 F.4th 269, 279 (5th Cir. 2024). And America did not criminalize possessing a firearm as an unlawful user of a

controlled substance until 1968. *See* Gun Control Act of 1968, Pub. L. 90-618, § 102, 82 Stat. 1213, 1220–21.

Still, the government deems it "irrelevant" that Contreras's predicate conviction "is not an updated version of a Founding-era crime." Gov't *Diaz* Rule 28(j) Ltr. 1. But *Diaz* says just the opposite. "Simply classifying a crime as a felony does not meet the level of historical rigor required by *Bruen* and its progeny." *Diaz*, 116 F.4th at 468–69. For example, *Diaz* recognized that "possessing a firearm as a felon—one of Diaz's three predicate convictions justifying the application of § 922(g)(1)—was not considered a crime until 1938 at the earliest." 116 F.4th at 468. And because the Founding generation did not punish firearm possession after a felony, that prior conviction was irrelevant to the Court's as-applied Second Amendment analysis. *Id.* That reasoning applies with even more force here because possessing a firearm as an unlawful drug user was not criminalized until decades later. In short, if Diaz's earlier felon-in-possession conviction could not justify an application of § 922(g)(1), then neither can Contreras's § 922(g)(3) conviction.

*Second*, even if the Court looks at the closest historical analogue to § 922(g)(3)—"intoxication via alcohol," *Connelly*, 117 F.4th at 279—there is still no tradition of severe punishment. In *Connelly*,

the Court surveyed the history of regulating guns and alcohol, finding that it supported, "at most, a ban on carrying firearms while an individual is presently under the influence." *Id.* at 282. The Court cited four Reconstruction-era laws from western states prohibiting intoxicated individuals from carrying guns. *Id.* at 281 (citing 1867 Kan. Sess. Laws 25; Mo. Rev. Stat. § 1274 (1897); 1883 Wis. Sess. Laws 290; 1909 Idaho Sess. Laws 6).[2]

But these laws do not establish any tradition of *severely* punishing individuals who carried guns while drunk. None of the laws imposes either capital punishment or forfeiture as a penalty for intoxicated carry. In fact, they punished intoxicated carry quite lightly. All four laws imposed minor fines—up to $200—or a short term of imprisonment—no more than 6 months—for carrying a gun

---

[2] It is somewhat unclear from *Connelly* whether these four laws actually establish a tradition for purposes of the Second Amendment analysis. The Court explained that these "non-Founding era historical laws are of, at best, limited utility," that the laws are "notably few," and that they "miss[ ] the mark by a wide margin" because they were not passed until Reconstruction. *Connelly*, 117 F.4th at 280–81. But whether or not they establish a tradition of banning intoxicated carry, they do *not* establish a tradition of severely punishing that conduct.

while drunk.[3] None of these intoxicated-carry laws "permanently punish[ed] offenders," so they cannot justify the "permanent disarmament that § 922(g)(1) imposes." *Diaz*, 116 F.4th at 469; *see United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024) ("Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding.").

### C. The government's alternative arguments are foreclosed by *Diaz* or at odds with the historical evidence.

Rather than engage in the analysis *Diaz* requires, the government advances several arguments that conflict with *Diaz*. Because *Diaz* is binding precedent, the Court must reject each argument.

*First*, the government cites a supposedly "longstanding tradition of disarming individuals who have committed serious crimes and who pose a special danger of misusing firearms." Oral Arg. at 19:55–20:04. This argument advances the same broad tradition the

---

[3] *See* 1867 Kan. Sess. Laws 25 (up to $100 fine and 3 months in jail); Mo. Rev. Stat. § 1274 (1897) ($5–$100 fine and up to 3 months in jail); 1883 Wis. Sess. Laws 290 (up to $100 fine and 6 months in jail); 1909 Idaho Sess. Laws 6 ($25–$200 fine or 20–60 days in jail).

Court already rejected in *Diaz*. There, the government cited an assortment of laws as establishing a tradition of disarming "individuals with convictions for serious criminal conduct or who … are likely to present a special danger of firearm misuse." *See* Gov't Supp. Br. 3, *United States v. Diaz*, No. 23-50452 (5th Cir. June 28, 2024). This Court declined to adopt that broad principle, instead adopting the narrower tradition the government cited of severely punishing certain crimes.

*Second*, the government argues that a § 922(g)(3) conviction is "at least as serious as the Founding-era theft crimes discussed in *Diaz*." Gov't *Diaz* Rule 28(j) Ltr. 1. Not so. After all, *Diaz* determined that "our country has a historical tradition of severely punishing people … who have been convicted of theft." 116 F.4th at 468–69. By contrast, the closest historical analogue to § 922(g)(3)—carrying a gun while intoxicated—generated only a small fine or a short stint in jail. *See supra* 13–14. In any event, "seriousness" is not the test adopted by *Diaz*, which relied on historical punishment. And "serious" is a "vague term," and it is "unclear what such a rule would entail." *See Rahimi*, 144 S. Ct. at 1903 (rejecting similar argument that government can disarm individuals who are not "responsible"). At oral argument, the government tried to ground

its proposed seriousness analysis in *current* punishment. Oral Arg. at 31:10–40 (noting that statutory maximum for Contreras's § 922(g)(3) offense exceeds that for Diaz's car theft). But current punishment is irrelevant. This Court recognizes that "not all felons today would have been considered felons at the Founding." *Diaz*, 116 F.4th at 469. So the Court must look to at whether a felon would have been severely punished "in the 18th century." *Id.* at 468, 469.

*Finally*, the government compares § 922(g)(3) to historical "going armed" laws. Gov't *Diaz* Rule 28(j) Ltr. 2. But going armed laws "provided a mechanism for punishing those who had menaced others with firearms." *Rahimi*, 144 S. Ct. at 1900. By contrast, § 922(g)(3) criminalizes mere possession of a firearm, whether or not someone has "terrif[ied] the good people of the land." *Id.* at 1901. And this Court has already held that the going armed laws do not support a tradition of disarming someone "whose underlying convictions do not inherently involve a threat of violence." *Diaz*, 116 F.4th at 471 n.5. Section 922(g)(3) involves no inherent threat of violence. At oral argument, the government claimed that there are "few things … as terrifying as an individual under the influence of some substance while armed." Oral Arg. at 26:07–16. But the Founders saw things differently. Those who carried a gun while

drunk got a slap on the wrist. *See supra* 13–14. And "Founding-era militias were notorious for imbibing heavily" and getting "gloriously drunk." *United States v. Daniels*, 77 F.4th 337, 346 n.16 (5th Cir. 2023), *cert. granted, judgment vacated*, 144 S. Ct. 2707 (2024).

*     *     *

In *Diaz*, this Court recognized that as-applied challenges to § 922(g)(1) may be successful if the underlying felony would not have been severely punished at the Founding. 116 F.4th at 470 n.4. Section 922(g)(3) is just such an offense. Gun possession by a user of a controlled substance was not even criminalized at the Founding, and the closest historical analogue was punished lightly. Thus, Contreras's prior conviction for possessing a firearm as an unlawful drug user cannot justify § 922(g)(1)'s lifelong ban on firearm possession.

## CONCLUSION

The Court should hold that § 922(g)(1) violates the Second Amendment as applied to Contreras.

Respectfully submitted.

JASON D. HAWKINS
Federal Public Defender
Northern District of Texas

PHILIP G. GALLAGHER
Interim Federal Public Defender
Southern District of Texas

JOHN D. MCELROY
Federal Public Defender
Eastern District of Texas

OMODARE JUPITER
Federal Public Defender
Northern & Southern Districts
of Mississippi

CLAUDE J. KELLY
Federal Public Defender
Eastern District of Louisiana

REBECCA L. HUDSMITH
Federal Public Defender
Middle & Western Districts of
Louisiana

MAUREEN SCOTT FRANCO
Federal Public Defender
Western District of Texas

s/ Carl R. Hennies
CARL R. HENNIES
Assistant Federal Public Defender
300 Convent Street, Suite 2300
San Antonio, Texas 78205
(210) 472-6700

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMIT

1. This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 3,311 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook in body text and 13-point in footnotes.

s/ Carl R. Hennies
CARL R. HENNIES
*Counsel for Amici Curiae*

Dated: November 15, 2024